Petition of Glenn E. **WOOD**, John A. Lauck, Mary Alyce Wood, and Doris Marie Lauck, Trustees of Loc-Wood Boat & Motors, Inc., a former corporation, and Glenn E. Wood, John A. Lauck, Mary Alyce Wood and Doris Marie Lauck, as individuals, For Exoneration From or Limitation of Liability.

No. 9469.

United States District Court
W. D. Missouri, W. D.
June 26, 1956.
As Amended July 31, 1956.

Edward A. Smith and Howard L. Swartzman, Kansas City, Mo., for petitioners.

Henry G. Eager and Roy P. Swanson (of Blackmar, Swanson, Midgley, Jones & Eager), Kansas City, Mo., Don W. Owensby, Buffalo, Mo., Bernard T. Schafersman (of Richards, Yost &

Schafersman), Fremont, Neb., and Harold J. Swailes, Belle Plaine, Iowa, for claimants and cross-libellants, Richard Lamberty, Darwin F. Rockwell, Darrell W. Hodges, Gladys Marie Hodges, Mose Gump, Ercie Gump, Vincent H. Allen, Jr., and Carole K. Allen.

Raymond J. Carroll, Chicago, Ill., and John R. Gibson (of Morrison, Hecker, Buck, Cozad & Rogers), Kansas City, Mo., for claimants and cross-libellants, Helen Fahey, Adm'x, of estate of Thomas P. Fahey, Jr., and Joseph Buckley, Adm'r of estate of Dorothy Fahey.

DUNCAN, Chief Judge.

This is a suit in Admiralty under the provisions of 46 U.S.C.A. §§ 183–189, by the trustees of the Loc-Wood Boat & Motors, Inc., of Lake Ozark, Missouri, the owner of a sight-seeing vessel known as the Grand Glaize for exoneration from liability, or, in the alternative, for limitation of liability to the value of the vessel, as a result of the overturning and capsizing of said vessel on the Lake of the Ozarks near Bagnell Dam on May 28, 1954.

The petition was filed in this court pursuant to Rules 51 and 54, Rules of Practice in Admiralty and Maritime cases promulgated by the United States Supreme Court, 28 U.S.C.A. Prior to the filing of this petition, several suits were instituted against the petitioners in the Circuit Court of Jackson County, Missouri, at Independence, for the wrongful death of certain passengers who were drowned.

Subsequent to the filing of this petition, this court issued a "Writ of Monition" under Rule 51 by publication, directing all persons having claims arising out of the capsizing of the Grand Glaize on the above date, to file such claims with the Clerk of this Court. This court also issued a Restraining Order under Rule 51, restraining the further prosecution of such suits in the State Court.

The petition alleges that on May 28, 1954, the Grand Glaize was "by reason of a sudden and violent tornado and heavy wind, overturned and capsized * * *", resulting in the death of the following passengers:

> Warren Lamberty
> Mrs. Letha E. Rockwell
> Rosalyne Ruth Rockwell
> Alice Lamberty
> Duane Wilbur Hodges
> Patricia Gump

The petition further alleges that the deaths above mentioned occurred without the privity or knowledge of the petitioners. Pursuant to the above order of this court, the following claims were filed in this proceeding:

(a) Lt. Vincent H. Allen, Jr., has filed a claim for the amount of $3,500 for the loss of personal property and for medical expenses, present and future, necessary for his wife, Carole K. Allen, as a result of her personal injuries and for loss of services.

(b) Carole K. Allen claims the amount of $5,035 for the loss of personal property, and for personal injuries.

(c) Mose Gump and Ercie Gump claim the sum of $25,000 for the wrongful death of their minor unmarried daughter, Patricia Gump, by suffocation or drowning.

(d) Darrell W. Hodges and Gladys Marie Hodges claim the sum of $25,000 for the wrongful death of their minor unmarried son, Duane Wilbur Hodges by suffocation or drowning.

(e) Darwin F. Rockwell claims the sum of $50,000 for the wrongful death of his wife, Letha E. Rockwell, and the sum of $25,000 for the wrongful death of Rosalyne Rockwell, the minor daughter of Darwin F. Rockwell and Letha E. Rockwell, both deaths having occurred either by suffocation or drowning.

(f) Richard Lamberty claims the sum of $50,000 for the wrongful death of his wife, Alice Mae Lamberty, and the sum of $25,000 for the wrongful death of Warren Richard Lamberty, the infant son of the said Richard Lamberty and Alice Mae Lamberty, both deaths having occurred either by suffocation or by drowning.

(g) Ruth E. O'Leary claims the sum of $5,000 for personal injuries sustained, and for the loss of personal property.

(h) Emmett D. O'Leary claims the sum of $5,397 for personal injuries sustained, and for the loss of personal property.

(i) Helen Fahey, Administratrix of the Estate of Thomas P. Fahey, Jr., deceased, claims the sum of $50,000 for the wrongful death of the said Thomas P. Fahey, Jr., said death having occurred either by suffocation or drowning.

(j) Joseph Buckley, Administrator of the estate of Dorothy Fahey, deceased, claims the sum of $50,000 for the wrongful death of the said Dorothy Fahey, said death having occurred either by suffocation or drowning.

The claimants also filed what they designated "Cross Libels" which, following the close of the trial of the case, the claimants have asked leave to dismiss or withdraw as being surplusage, and that leave is hereby granted.

Sometime prior to May 28, 1954, the corporate charter of Loc-Wood Boat & Motors, Inc., was forfeited by the State of Missouri for failure to comply with the statute with respect to filing annual reports, but subsequent to the above date, the charter was reinstated, and it is now admitted by the claimants that the corporation was in existence at the time of the capsizing of the boat, and was and is, the real owner thereof.

It is further agreed that the claims as to the petitioners Glenn E. Wood, John A. Lauck, Mary Alyce Wood and Doris Marie Lauck, as trustees of Loc-Wood Boat & Motors, Inc., should be dismissed, and that Loc-Wood Boat & Motors, Inc., a corporation, be substituted in their stead. In accordance with that suggestion, the action is hereby dismissed as to the individual petitioners, and the petition will be considered against the corporation as the owner of the vessel.

The law applicable to this case is not in dispute, and we are confronted wholly with the factual situation as to whether or not there should be an exoneration or limitation of liability. § 183, Title 46 U.S.C.A. provides as follows:

"The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

In their answers, the claimants deny that the petitioners are entitled to exoneration or limitation of liability under Title 46 U.S.C.A. §§ 183–189 as aforesaid, and they allege that the vessel Grand Glaize overturned and capsized as a direct and proximate result of the negligent acts, defaults and failures on the part of the petitioner, the owner of the vessel, and on the part of its servants and representatives, and that such acts occurred within the knowledge and privity of the petitioner, owner and operator thereof. The specific acts charged are that:

"(a) The said vessel was not properly or competently manned, operated, piloted, supervised, managed, regulated or directed.

"(b) The said vessel was not properly or adequately equipped or maintained for inclement weather including conditions of wind, rain and high waves.

"(c) The said vessel was not seaworthy.

"(d) The said vessel was not properly equipped or supplied for the safety of its passengers in the event of maritime accident or disaster.

"(e) The said vessel was permitted, suffered, ordered and directed

to leave the said docking facilities at a time when an approaching frontal condition of wind, rain and high waves either was or should have been observed over and upon the lake to the westward.

"(f) They failed to learn about or to obey and to rely upon published weather forecasts of storm and tornado condition at a time when they either knew or should have known of the existence of said forecasts and the maritime dangers incidental to such weather condition.

"(g) They failed to warn or to notify any of the passengers for hire before the said vessel left the dock that storm and tornado conditions or wind, rain and high waves either then and there existed or were expected to exist shortly thereafter upon and over the lake to the westward.

"(h) Despite ample time therefor, they failed to control, to pilot or to steer the said vessel after it had left the dock and was operating under its own motive power upon the surface of the lake so as to avoid and to by-pass completely the frontal condition of wind, rain and high waves after said condition either was or should have been observed by the pilot.

"(i) They continued to operate, to pilot or to steer the said vessel straight ahead and generally westward into the frontal condition of wind, rain, and high waves after said condition either was or should have been observed by the pilot and at a time when the said vessel could have been directed and taken into protecting coves and bays along and near the shoreline of said lake.

"(j) Despite ample time and opportunity therefor they failed to turn the said vessel around and to return or commence to return it to the dock before the said vessel reached and entered into the frontal condition of wind, rain and high waves and at a time when said con-dition was visible ahead of the said vessel and upon and over the surface of the lake.

"(k) They failed to keep the bow of the said vessel pointed or headed straight into the frontal condition of wind, rain and high waves after the vessel had reached and passed into the midst of said frontal condition.

"(l) They attempted to pilot, to guide or to steer said vessel approximately 180 degrees to its left or port side after it had already passed into and was completely surrounded by the frontal condition of wind, rain and high waves and at a time when the said frontal condition had not abated or reduced in intensity.

"(m) They failed to order, to direct, to command, or to supervise the donning of life jackets or life preservers by the passengers at a time when the entry of the said vessel into the frontal condition of wind, rain and high waves appeared and became imminent to the pilot.

"(n) They did not make life jackets or similar means of buoyancy available and readily accessible to the passengers nor did they store and keep any of said equipment or accessories in places and compartments, which were plainly marked and labelled with the contents thereof all for the benefit of the passengers.

"(o) They disobeyed the general rules and regulations concerning inland navigation and particularly those which have been promulgated by the United States Coast Guard.

"(p) In performing and in committing or in failing to perform and to commit each and all of the foregoing specific acts, neglects, defaults and failures they failed to exercise the highest degree of care for the safety of their passengers for hire."

All of these allegations the petitioner denies.

The Lake of the Ozarks in central Missouri is the result of the impounding of the waters of the Osage River, a navigable stream, by Bagnell Dam. As a consequence, it is physically impossible for boats to operate freely up and down the Osage River. However, this fact does not destroy the legal concept of navigability since the Osage River is an historically navigable stream, and remains under the control of the Department of Commerce, which licenses boats and vessels operating upon the Lake of the Ozarks. Such boats and vessels are also subject to inspection as to seaworthiness by the United States Coast Guard.

The petitioners, Glenn E. Wood, John A. Lauck, Mary Alyce Wood and Doris Marie Lauck, were, on May 28, 1954, the officers and stockholders of Loc-Wood Boat & Motors, Inc., a corporation, organized under the laws of the State of Missouri.

The Loc-Wood Boat & Motors, Inc., operated a boat dock adjacent to, and immediately southwest of Bagnell Dam, located on the Lake of the Ozarks. On May 28, 1954, and for some years prior thereto, the Loc-Wood dock operated a marine vessel known as the Grand Glaize which was operated from the dock aforesaid, for sight-seeing purposes for tourists at the Lake of the Ozarks.

On the day in question, and for some time prior thereto, the petitioners and their employees solicited persons as passengers for hire on the Grand Glaize and other vessels for a sight-seeing tour on the Lake of the Ozarks. This solicitation was by means of sign advertising and a loudspeaker. The ticket office or booth of the petitioner is located near the east side of U. S. Highway 54 which crosses the dam, and to the south thereof, probably 25 or 30 feet above the surface of the water, is located a floating dock, to which the boats are anchored. On this floating dock is located a refreshment stand and facilities for passengers to await their turn in boarding the boats. Immediately to the west of the boat dock there is what is designated in evidence as "Allen's Point" which extends from the mainland into the lake, one-half mile or more from the boat dock, and beginning at the point of this promontory, the channel of the lake veers to the left, or to the west, thus cutting off from view to a considerable extent, that portion of the Lake beyond the western extremity of "Allen's Point", known as "Gravois Arm".

The promontory is covered by a growth of trees. The elevation of the land upon which the ticket office is located, is approximately the same elevation as that of "Allen's Point" with the exception of the trees that grow upon the promontory, which, to that extent, obstruct the view of the Lake to the southwest from the ticket office. A microphone is located in the ticket office of the petitioner, and attached thereto, is a loud speaker, the coverage of which is extensive over the area, and from which the ticket agent announces the schedule of trips, the cost thereof, and solicits passengers to take boat rides upon the lake.

On the morning of the tragedy, the weather was varying. It rained and the sun shone intermittently; it was cloudy and it was clear, changing from one to the other rather suddenly, from heavy clouds to light overcast, and from sunshine to rain. Through a broadcasting station located in the area, announcements of surrounding weather conditions were made at regular intervals. These announcements are accessible to those who operate the boat excursion lines. On the morning of May 28, 1954, the forecaster had announced a storm area and the probability of high winds, rain, and a possible tornado, but the forecast as to the tornado, was for an area around Warrensburg, more than 100 miles away.

All of the persons who became passengers on the Grand Glaize were tourists, unfamiliar with the local surroundings or the conditions on the Lake. The boat was originally loaded between 1:00 and 2:00 o'clock, but before it sailed, a rain came up and the passengers were asked to leave the boat and take shelter on the floating dock. After the rain was

over, the seats on the boat were dried and the passengers again boarded the boat for their trip, and left about 2:00 o'clock. One of the officers of the corporation, either Glenn E. Wood or John Lauck, or John Irwin, a supervisor of operations, gave the signal for the boat to leave. It is undisputed that at the time the Grand Glaize left the dock, the following passengers for hire, in addition to the pilot, were aboard:

Richard Lamberty, his wife, Alice Mae Lamberty, and his son, Warren Lamberty.
Lt. Vincent H. Allen, and his wife, Carole K. Allen.
Emmett D. O'Leary, and his wife, Ruth E. O'Leary.
Darwin F. Rockwell, his wife, Letha E. Rockwell, and his daughter, Rosalyne Ruth Rockwell.
Duane Wilbur Hodges.
Patricia Gump.

According to the testimony of the pilot, and some of the passengers aboard, at the time the Grand Glaize pulled away from the Loc-Wood dock, the water was calm and it is contended by the petitioner, that there was nothing unusual about the weather aside from a slight, broken overcast. The pilot of the Grand Glaize testified that he noticed nothing unusual concerning the weather. He directed the vessel in a westwardly direction on the lake into the "main channel" of the lake, according to the usual route taken by him on all such excursions. This route generally followed the right side of the Lake going up the Lake for several miles, depending on the type of trip, past Allen's Point, and then to return to the dock down the left side of the Lake. When the Grand Glaize was approximately twenty to twenty-five minutes out on this excursion, the petitioner's evidence reveals that a large black cloud was seen approaching from the west in an easterly direction. The cloud apparently was so large that it extended over the entire range of vision from the north to south. It apeared to be approaching quite rapidly, and within a period of approximately five minutes from the time the cloud was sighted, rain commenced to fall and strong winds began.

As the vessel proceeded up the Lake, the rain and wind steadily increased. The pilot estimated the wind at between 50 and 60 miles per hour, and that waves of five or six feet in height began tossing the vessel about. For a short period of time the pilot steered the bow of the vessel directly into the wind and waves. Then, at a point approximately two miles west of Bagnell Dam, the pilot steered the vessel in an abrupt manner to the left or south in an effort, according to his testimony, to turn completely around to find a cove which he had passed, or, in the alternative, to return to the dock. When the vessel had reached a point approximately 90° to the left of its original direction of movement, a combination of the wind and high waves beating upon the right side of the vessel caused it to capsize toward its right, or starboard side.

The pilot, Perry E. Graham, Jr., was a young man, eighteen years of age, had been licensed as a pilot the season before by the Coast Guard, and had worked around the Lake for a considerable period of time. He had been employed as a pilot by a competing company during the season of 1953. The evidence revealed that he had made approximately 400 trips over the same route which he was destined to take on this day. He had never before, so far as the evidence reveals, experienced any difficulty in the operation of this boat or any other boat under his control.

Of the passengers aboard, six lost their lives. Some of the bodies were recovered almost immediately, others some days later, and still others have never been found. A rescue boat came from an adjoining fishing resort, and the petitioner also sent out a boat to render assistance, and to return the survivors to the dock.

The court and counsel are in agreement as to the applicable law. If the boat was seaworthy, and if there was no negligence on the part of the pilot, and

no negligence on the part of the owner in sending the boat out in the impending storm, then it will be fully exonerated, and there is no liability for the loss of life or property. If the owner was free of negligence as to the selection of the pilot, and as to the seaworthiness of the boat, but the pilot himself was guilty of negligence in its operation, then its liability would be limited to the value of the boat. If the owner was guilty of negligence in any of these respects, either in the selection of the pilot, in the matter of the seaworthiness of the vessel, or in sending the vessel upon its voyage during an impending storm, then it is fully liable for all damages which may have resulted.

■ I think we may first dispose of the question of the seaworthiness of the vessel. The vessel had been overhauled within a reasonably short time before it capsized, and, so far as the evidence reveals, it was in good mechanical condition. There is no substantial evidence that there was any defect in the construction of the boat, or in its method or manner of operation, or means of control. An adequate number of suitable and serviceable life jackets were placed beneath the seats, or elsewhere where they were accessible. The claimants strongly contend that the owner was negligent in this respect, but it is the opinion of the court that there were life jackets on the boat, but that even if they had been more readily accessible, and advantage could not have been taken of any life jackets at any earlier period during the emergency, it would not have prevented the loss of life, because of the suddenness with which the boat capsized.

When the boat capsized, one of the passengers, Lt. Vincent H. Allen, was thrown clear of the deck, and he dived into the cabin several times to assist persons and to release life jackets, and they were floating upon the water around the boat. Because of the rain, several of the passengers had sought shelter within the enclosure of the boat, so that when it capsized, they were trapped in the cabin, rather than being on the deck.

The court must conclude, therefore, that the vessel was seaworthy, and that the owner was not negligent in any respect as to the maintenance of its equipment, or the location of life jackets.

■ The same may be said with respect to the selection of the pilot. As has heretofore been stated, the pilot was eighteen years of age, he had been licensed as a pilot by the Coast Guard for more than a year; was entirely familiar with the Lake, and had made more than 400 trips of the same character that he was making on this day. Seemingly, he was familiar with the operation of the boat. I think it cannot be said that the owner was negligent in failing to anticipate that the pilot would fail to exercise that judgment, which, in the opinion of the court, he should have exercised, in the absence of any showing of prior lack of judgment. This, of course, was the first time he had faced an emergency of any serious nature.

The evidence reveals that at least after the pilot rounded "Allen's Point", he had a clear view of the Lake for at least five miles. Certainly the storm was approaching at that time. Another witness, who was piloting a vessel belonging to a competitor, the Larry Don, left approximately 10 minutes after the Grand Glaize, and he testified that it took him approximately 10 minutes to reach Allen's Point, and that as he did so, he saw the storm coming down the Lake, and he immediately took cover in a cove. His vessel was of an entirely different type; it was a flat-bottom boat, 65 feet long and 30 feet wide, which made it far more seaworthy in that type of water. Surely during the 10 minutes that the pilot of the Larry Don was going from his own dock to Allen's Point, the storm was approaching. That cannot be denied.

■ The pilot of the Grand Glaize had a clear view. He says that it became dark suddenly, and that the rain came upon him suddenly. There is no dispute about the fact that it did become dark rather quickly. He says he knew he had passed a cove to his right, but he

was not certain of its entrance, and he therefore sought to turn the boat to the left, which would necessitate the making of a complete turn, or a loop, in order to enter the cove, and that as he did so, the storm caught the boat and caused it to capsize.

The evidence reveals that it is a matter of good sense, based upon even ordinary seamanship, that the type of boat he was piloting would in all probability have withstood the storm had he kept it headed into the storm, but that to turn it so that it was hit broadside by the waves and the wind, would almost certainly result in either capsizing or sinking of the boat. In this, it is the opinion of the court, the pilot was definitely lacking in good seamanship, and was clearly negligent, which would render the owner liable to the extent of the value of the boat. The fair estimate of the value of the boat was $3,500.

█ We next come to the question of whether or not the owner, through its officers, agents or employees, was guilty of negligence in sending the boat out. The legal status of the petitioner was that of a common carrier for hire, and, under the laws of the State of Missouri, it was chargeable with the highest degree of care for the safety of its passengers, and is liable for slight negligence.

First, we may assume that tornadoes or winds of hurricane proportions "do not drop out of clear skies", although they come up on rather short notice. Most of the surviving passengers, and many of the witnesses, stated that at the time the boat left, there was nothing to indicate the approach of a storm, and although it was cloudy, the clouds were broken, and some witnesses said the sun was shining through, that it was calm. Apparently it was "the calm before the storm."

█ Those who were to become passengers on the boat were tourists, for the most part. It was their holiday. Apparently they were not observant of the condition of the elements. Certainly, persons who are to become passengers on a boat under such circumstances, owe themselves some responsibility, but they likewise have a right to rely upon those who hold themselves out as carriers to observe the conditions of the weather in which their ships will sail, and that they will not permit them to sail into the path of a storm. As shown by the evidence, storms arise rather quickly in this area.

█ There were witnesses, some of whom were a considerable distance away from the place where the storm hit, who testified that they saw the storm approaching, and that the clouds were black and grey, and rolling, as though they were being whipped by the wind. The grandparents of one of those who were lost, stated that they were seated in their automobile on the high ground above the dock, waiting for their granddaughter and her companion, both of whom were lost, and that they observed the grey rolling clouds on the horizon about the time the boat left the dock.

It seems almost inconceivable that a storm of the severity of the one with which we are dealing, could have approached so rapidly as to be unnoticed at the spot where the representatives of the petitioner were at all times located, and particularly at the time the Grand Glaize was waved away. Although their vision was to some extent obstructed by the extension of Allen's Point, yet the horizon beyond was visible, and the clouds must have been visible from their vantage point, if it was such as to have produced the storm of such intensity and severity within 15 to 20 minutes after the boat left its moorings.

The operation of a boat such as the Grand Glaize constitutes the owner thereof a common carrier for hire, with its duty to exercise the highest degree of care. The owner is liable for slight negligence, and it seems to me that the very high degree of care which it owed to those passengers, would have prompted the agents of the petitioner to anticipate the approach of the storm, and that their failure to do so, renders the petitioner fully liable. The pilot must have known of the danger before he left, because ac-

cording to several witnesses, he said immediately after the boat had capsized, "Oh, my God! Why did they send me out!" This was a spontaneous statement made while he was in a position of great peril.

Section 537.070 RSMo 1949, V.A.M.S. provides in part:

"Whenever any person * * * shall die from any injury resulting or occasioned by the negligence, unskillfulness or criminal intent of any officer, agent, servant, or employee, whilst running, conducting or managing any locomotive, car or train of cars, or any street electric or terminal car or train of cars, or of any master, pilot, engineer, agent or employee whilst running, conducting or managing any steamboat, or any of the machinery thereof, * * * shall forfeit and pay as a penalty for every such person, employee or passenger so dying, the sum of not less than two thousand dollars, and not exceeding ten thousand dollars, in the discretion of the jury, which may be sued for and recovered:

"(1) By the husband or wife of the deceased; or

"(2) * * *

"(3) If such deceased be a minor and unmarried, whether such deceased unmarried minor be a natural born or adopted child, if such deceased unmarried minor shall have been duly adopted according to the laws of adoption of the state where the person executing the deed of adoption resided at the time of such adoption, then by the father and mother, who may join in the suit, and each shall have an equal interest in the judgment; or if either of them be dead, then by the survivor; or

"(4) If there be no husband, wife, minor child or minor children, natural born or adopted as herein indicated, or if the deceased be an unmarried minor and there be no father or mother, then in such case

suit may be instituted and recovery had by the administrator or executor of the deceased and the amount recovered shall be distributed according to the laws of descent, * * *."

Section 537.080 provides:

"Whenever the death of a person shall be caused by a wrongful act, neglect or default of another, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured."

Section 537.090 provides:

"Damages accruing under section 537.080 shall be sued for and recovered by the same parties and in the same manner as provided in section 537.070; and in every such action the jury may give such damages, not exceeding fifteen thousand dollars, as they may deem fair and just, with reference to the necessary injury resulting from such death, to the surviving parties who may be entitled to sue, and also having regard to the mitigating and aggravating circumstances attending such wrongful act, neglect or default."

■ Clearly this action falls within the provisions of § 537.070 as to its penalty provisions, and a penalty may be assessed against the petitioner in any sum from $2,000 to $10,000; also having in mind § 537.090 and the question of whether or not there are mitigating or aggravating circumstances involved in connection with the injury or death. I am unable to find any evidence indicating any aggravating circumstances insofar as the petitioner is concerned, which would entitle the claimants to an amount in excess of the minimum penalty.

■ In view of the limitation of liability under the Admiralty rules, to the

value of the vessel for the sole negligence of the pilot, the penalty provision would not extend to liability insofar as his negligence is concerned, but only to the owner of the vessel.

It is, therefore, the conclusion of the court, that with respect to the death of each person for whom claim has been made, except the claims of Helen Fahey and Joseph Buckley for wrongful deaths, and Richard Lamberty for the death of his wife Alice Mae Lamberty, and Darwin F. Rockwell for the death of his wife Letha E. Rockwell, the claimants are entitled to a penalty of $2,000 for each wrongful death.

■ The laws of Missouri, aside from those respecting the loss of services of a wife or husband, are very indefinite as to the measure of damages which may be assessed for wrongful death. In an action for the death of a wife, the husband may recover not only the pecuniary loss, but also for loss of companionship and other elements incidental to the marital relationship, but this does not apply as to a son or daughter, and the measure of damages in the latter case must be measured by the actual pecuniary or monetary loss which has been sustained by the parent.

■ There is no evidence in the record indicating the actual value of the services of the minors who were drowned, and, of course, it is difficult to compute such value. As was said in Albert v. St. Louis Elec. Term. Ry. Co., 192 Mo.App. 665, 179 S.W.2d 955, 957:

"There is no evidence in the record, either pro or con, tending to throw light upon the probable earning capacity of this infant in after years. Of course, the law requires none in such cases. Indeed, it is the accepted rule of decision that where this subject-matter comes in question with respect to the death of an infant, the jury may fix the amount of the recovery, without evidence thereon, through utilizing their own knowledge and experience, presumptively possessed by them in common with mankind in general."

Applying this principle, it may be truthfully said that in this modern age there are few instances in which there is any reasonable probability to expect that the parents will derive any actual monetary gain from their infant children. Experience teaches us that the expense of rearing and educating children is many times greater than their earning capacity. There is also the modern trend, whether or not it be legally true, that parents in this day and age do not possess themselves of the earnings of their infant children, even if they have any earnings. The court must also take into consideration the fact that economic conditions of the age are not conducive to children earning any considerable sums of money until they are at least out of high school, and then if they do go to work, they usually retain their own earnings, or they go to college, where the expenses upon the parents are many times greater than the earning capacity that the child might have.

That is well borne out by the evidence with respect to Duane Wilbur Hodges, who had just finished high school at the age of 19 and was preparing to enter college at the time of his death; such money as he earned was retained by him for his own use, and was used to purchase an automobile. He had contributed nothing, so far as money was concerned, to the family budget, although his services had been of very considerable value to his father as a farmer.

I shall now take up each of the claims for wrongful death in this proceeding.

■ Letha E. Rockwell was 48 years of age at the time of her death, was in good health, lived on a farm, and performed the usual duties of a woman on a farm. In addition, she was employed as a substitute school teacher, for which services she received the sum of $240.00 per month. For her death, the claimant, Darwin F. Rockwell, her husband, is entitled to recover the sum of $15,000 as actual damages.

860

Rosalyne Ruth Rockwell, the daughter of the claimant, Darwin F. Rockwell, was born in October, 1937, and was 16 years of age at the time of her death. She was a senior in high school and was in good health, lived on a farm and did the usual duties around and about the farm. For her death, the claimant, Darwin F. Rockwell, is entitled to recover $2,000 as a penalty, and $4,000 as actual damages.

Alice Mae Lamberty, the wife of Richard Lamberty, was 25 years of age. She was likewise a housewife, apparently in good health, and performed the usual duties of a housewife. For her death the claimant, Richard Lamberty, is entitled to recover the sum of $15,000 in actual damages.

The claimant, Richard Lamberty, also lost a son, Warren Lamberty, who, at the time of his death, was 2½ years of age. The reasoning which the court has applied to the economic laws of service of minor children may well be applied to him. Certainly, in a very practical way, it is reasonable to assume that the cost to the father of rearing this child would far exceed any actual monetary returns from the earnings of his infant son.

It was recently stated by an educator, that it now costs approximately $18,000 to rear a child and put him through four years of college. This is a conservative estimate, and yet, in dealing with claims for the wrongful death of minor children, even based upon the rigid laws of Missouri, we cannot adhere strictly to so cold-blooded a valuation. For the death of Warren Lamberty, the claimant, Richard Lamberty, is entitled to the sum of $2,000 as a penalty, and the sum of $3,000 as actual damages.

Patricia Gump's body was never found. She also was 16 years of age, was in good health, had gone to the Lake with Duane Wilbur Hodges, who was also drowned. Her father was put to considerable expense in connection with attempting to find her body, and other expenses incident to her death.

The same thing may be said with respect to Patricia Gump that has been said with respect to Rosalyne Ruth Rockwell. Claimants, Mose Gump and Ercie Gump, the surviving parents of Patricia Gump, are entitled to recover the sum of $2,000 as a penalty, and the sum of $4,000 as actual damages.

We next come to the last admitted death, the claim for Duane Wilbur Hodges, who was 19 years of age, and who had finished high school, and whose body was never located. His father and mother lived on a large farm in Iowa, and had five other children. Duane, like all farm boys, did the usual things that were to be done about the farm, ran the machinery, looked after the stock, and did a man's work. The father testified that it would cost $100 a month to replace him on the farm.

However, the evidence further reveals that during the summer preceding his graduation, he had earned a considerable sum of money in employment away from the farm, and had used that money to purchase an automobile for his own use, and that the father and mother had received no part of the earnings. He had discussed going to agricultural college, and intended to work away from home to earn at least a portion of the money to meet his college obligations. This is rather indicative of the fact that the father and mother could not have expected much further service from him on the farm. He was within two years of his majority, and it might reasonably be expected that after entering college, he would not again be home to perform the usual duties, except during vacation time. I think the surviving parents are entitled to recover the sum of $2,000 as a penalty, and the sum of $1,500 as actual damages.

Emmett D. O'Leary and his wife, Ruth E. O'Leary, have filed claims for personal injuries, and for the loss of personal property. Neither of these persons appeared in court at the time of trial, either in person or through counsel, and there is no evidence of any kind in the record to substantiate their claims. Ac-

cordingly, the respective claims of Emmett D. O'Leary and Ruth E. O'Leary should be, and they are, hereby dismissed.

 Lt. Vincent H. Allen and his wife Carole K. Allen, each claim damages. Lt. Allen makes claim for the loss of his own personal property, and also for loss of his wife's services, and for doctor bills. He lost such clothing as he was wearing, and a watch valued at $85, and a watch band, $120 in cash, and $105 in checks, which checks he says have never been replaced. He received no bodily injuries.

His wife, Carole K. Allen, sustained some personal injuries, and as a result, shock. She was inside the cabin, and as the boat went over, she felt her way inside of the cabin until she found an open window, and was able to release herself. Her husband, who had been thrown clear, assisted her to the bottom of the capsized boat, and he then by diving into the interior of the boat, released a number of life jackets for the survivors. He and his wife later started to swim to shore and were picked up by the relief boats arriving on the scene. She has been attended by a doctor on several occasions since the event, and complains that she had severe pains during her menstrual period for a considerable period of time, which she never experienced prior to May 28, 1954. She claims she was unable to perform her usual household duties during these periods. Although there is no evidence of any monetary loss to the husband, with the exception of some minimal doctor bills and medicine, I find that $750 would adequately compensate the claimant Lt. Allen for his damages. Mrs. Carole K. Allen, his wife, is entitled to $1,500 for her personal injuries.

 The final claims are those of Helen Fahey, the mother and administratrix of the estate of Thomas P. Fahey, Jr., and Joseph Buckley, the administrator of the estate of Dorothy Fahey, who claim damages for the death of the newly married couple. There is a dispute as to whether these two persons were passengers on the "Grand Glaize" when it capsized. The evidence of the claimants tended to show that Thomas and Dorothy Fahey were married May 22, 1954, in Chicago, where they lived, and they had gone to the Lake of the Ozarks on their honeymoon, and were staying at a resort located at Linn Creek, Missouri, and had been there for several days.

The owner of the resort testified that on the morning of the tragedy, she had a conversation with Mrs. Fahey, in which she stated they were going sight-seeing, and that her husband wanted to take a boat ride. She never saw them after that. She further testified that on the evening of May 28, she saw their car, a Plymouth with an Illinois license plate, parked in the parking area near the Loc-Wood Boat dock.

Numerous persons who were passengers on the boat, and also the owner, testified that there were only eleven grown persons and one child on the boat as passengers, in addition to the pilot, and that tickets were not sold to any greater number of persons than that. None of the survivors, or those who witnessed the loading of the boat, recalled seeing Mr. and Mrs. Fahey on the boat prior to the capsizing.

Two witnesses testified that during the period immediately after the capsizing of the boat, and during the confusion, and the attempt of the passengers to save themselves, or be saved, they heard a male voice call "Dorothy, Dorothy", which was the name of Mrs. Fahey. This is the only evidence that in the slightest way indicates that they may have been aboard the boat.

It appears that none of the other passengers were named Dorothy. Other persons testified that the car was not parked in the parking area on the evening of May 28, but was seen there a day or two later. Glenn E. Wood, one of the officers of the corporation, testified that he first saw the car there on Monday, two days later, and that it was not there on the evening of May 28, 1954. This is the extent of the evidence with respect to their presence on the ill-fated boat.

In view of all the evidence, I do not believe that the testimony with respect to the hearing of the name "Dorothy" is sufficient to establish their presence on the boat. They may have been in another boat. A row boat was found up the Lake sometime later, sunken in a cove some distance from this tragedy, and it was brought down to the dam and later reclaimed by its owner. There were some articles of feminine apparel in the row boat, but there was no evidence to connect it with the Faheys, so the evidence is simply lacking as to what happened to them. Their bodies were never found.

The court must, therefore, find against the claimants Helen Fahey and Joseph Buckley, and in favor of the petitioner as to the claims for the alleged wrongful deaths of Dorothy Fahey and Thomas P. Fahey, Jr.

If the parties hereto desire to submit further Findings of Fact and Conclusions of Law, they may do so within ten days hereafter.