**LOC–WOOD BOAT & MOTORS, Inc., a corporation, Appellant,**

v.

Darwin F. ROCKWELL; Richard Lamberty; Mose Gump and Ercie Gump; Darrell W. Hodges and Gladys Marie Hodges; Carole K. Allen, and Vincent H. Allen, Jr., Appellees.

No. 15695.

United States Court of Appeals Eighth Circuit.

June 20, 1957.

Rehearing Denied July 22, 1957.

Edward A. Smith and Howard L. Swartzman, Kansas City, Mo., for appellant.

Henry G. Eager, Kansas City, Mo., and Bernard T. Schafersman, Fremont, Neb. (Blackmar, Swanson, Midgley, Jones & Eager, Kansas City, Mo., and Richards, Yost & Schafersman, Fremont, Neb., on the brief), for appellees.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal from a decree in admiralty determining that the Loc-Wood Boat & Motors, Inc., a Missouri corporation, which owned a motor boat, Grand Glaize, was liable for personal injuries, property loss and deaths which occurred May 28, 1954, at about 2:30 in the afternoon, when the boat capsized on the Lake of the Ozarks during a storm. The Grand Glaize was 36 feet long and 8½ feet wide, and was used to carry passengers on sight-seeing trips on the lake.

■ The Lake of the Ozarks was created by the Bagnell Dam in the Osage River. The lake is entirely within the state of Missouri, but is navigable water within the admiralty and maritime jurisdiction of the United States. The Propeller Genesee Chief, 12 How. 443, 457, 13 L.Ed. 1058; Southern Steamship Co. v. National Labor Relations Board, 316 U.S. 31, 41, 62 S.Ct. 886, 86 L.Ed. 1246; 46 U.S.C.A. § 188.

The instant proceeding originated upon a petition in the District Court for exoneration or for limitation of liability under 46 U.S.C.A. § 183(a).[1] The Loc-

1. "§ 183.
  "(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of

Wood Boat & Motors, Inc., on behalf of which certain individuals filed the petition, will be referred to in this opinion as "the petitioner".

The appellees are persons who presented claims for damages for deaths, injuries and losses resulting from the capsizing of the boat. They will be referred to as "claimants".

The petitioner asked exoneration from liability for the losses, injuries and deaths, or that its liability be limited to the value of its interest in the boat at the close of the voyage if it should be determined that the injuries and deaths were due to the wrongful act of an employee of the petitioner but without its "privity or knowledge". Needless to say, the claimants resisted exoneration or limitation of the petitioner's liability. The value of the boat was $3,500 as estimated by the District Court. The District Court denied both exoneration and limitation of liability.

Much of the evidence was undisputed, and we shall not state the facts in detail. The opinion of the District Court is reported in 145 F.Supp. 848, Petition of Wood.

The petitioner on May 28, 1954, had a floating dock adjacent to and just southwest of the Bagnell Dam, which is at the easterly end of the lake. From this dock tourists boarded the Grand Glaize for sight-seeing trips on the lake. The ticket office of the petitioner was located above and near the dock and on the east side of the highway which crosses the Dam. The office was some 14 to 20 feet above the surface of the lake on May 28, 1954.

■ May 28, 1954, was a day of unsettled weather in the vicinity of the lake. There had been a storm warning broadcast in the morning. The possibility of a tornado in Missouri, but not in the vicinity of the lake, had also been predicted. The boat was boarded by passengers between one and two o'clock in the afternoon, but, before the boat left the dock, the passengers were disembarked, to take shelter on the floating dock, because of a shower. After the rain stopped, the passengers boarded the boat, and one of the petitioner's duly authorized employees gave a signal, from the ticket office, for the boat to leave. This was shortly after two o'clock. It is undisputed that there were 12 passengers and the pilot on board. The pilot took his usual westerly route, following close to the north shore of the lake. He testified that after he had gone about a mile or a mile and a quarter, it started to rain, and that a short time after this it started raining harder, and he then turned the boat to the left and was heading back down the lake when the wind turned the boat over. Other evidence indicates that the pilot turned the boat into the trough of the waves after the storm struck, instead of keeping its bow directly into the wind, which was blowing a gale from the west. As a result of the turning over of the boat, six passengers lost their lives; one passenger, Carole K. Allen, was injured, and her husband suffered some loss of personal property and was subjected to some expense on account of his wife's injuries. The trial court was justified in finding that the pilot was guilty of actionable negligence.

The important and controlling question in the case was whether the approach of the storm which capsized the Grand Glaize was visible from the ticket booth of the petitioner at the time petitioner's employee gave the signal for the boat to leave the dock, and whether the petitioner was therefore, as a carrier of passengers for hire, guilty of negligence in sending the boat out. In his memorandum opinion, the trial judge expressed his views on this issue as follows (145 F.Supp. 857–858):

such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forefeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

"First, we may assume that tornadoes or winds of hurricane proportions 'do not drop out of clear skies', although they come up on rather short notice. Most of the surviving passengers, and many of the witnesses, stated that at the time the boat left, there was nothing to indicate the approach of a storm, and although it was cloudy, the clouds were broken, and some witnesses said the sun was shining through, that it was calm. Apparently, it was 'the calm before the storm.'

"Those who were to become passengers on the boat were tourists, for the most part. It was their holiday. Apparently they were not observant of the condition of the elements. Certainly, persons who are to become passengers on a boat under such circumstances, owe themselves some responsibility, but they likewise have a right to rely upon those who hold themselves out as carriers to observe the conditions of the weather in which their ships will sail, and that they will not permit them to sail into the path of a storm. As shown by the evidence, storms arise rather quickly in this area.

"There were witnesses, some of whom were a considerable distance away from the place where the storm hit, who testified that they saw the storm approaching, and that the clouds were black and grey, and rolling, as though they were being whipped by the wind. The grandparents of one of those who were lost, stated that they were seated in their automobile on the high ground above the dock, waiting for their granddaughter and her companion, both of whom were lost, and that they observed the grey rolling clouds on the horizon about the time the boat left the dock.

"It seems almost inconceivable that a storm of the severity of the one with which we are dealing, could have approached so rapidly as to be unnoticed at the spot where the representatives of the petitioner were at all times located, and particularly at the time the Grand Glaize was waved away. Although their vision was to some extent obstructed by the extension of Allen's Point, yet the horizon beyond was visible, and the clouds must have been visible from their vantage point, if it was such as to have produced the storm of such intensity and severity within 15 to 20 minutes after the boat left its moorings.

"The operation of a boat such as the Grand Glaize constitutes the owner thereof a common carrier for hire, with its duty to exercise the highest degree of care. The owner is liable for slight negligence, and it seems to me that the very high degree of care which it owed to those passengers, would have prompted the agents of the petitioner to anticipate the approach of the storm, and that their failure to do so, renders the petitioner fully liable. The pilot must have known of the danger before he left, because according to several witnesses, he said immediately after the boat had capsized, 'Oh my God! Why did they send me out!' This was a spontaneous statement made while he was in a position of great peril."

The trial judge made the following findings:

"6. The motor boat Grand Glaize left the company's dock near Bagnell Dam on Lake of the Ozarks on May 28, 1954, at a time when an approaching and impending storm of a severe nature was visible over the lake toward the west and northwest from the petitioner's elevated ticket booth.

"7. The Grand Glaize was thereupon negligently directed to leave and to proceed out onto the lake in the direction from which the storm was approaching by Glenn E. Wood

who was then in the ticket booth or its immediate vicinity and was the managing agent of the corporation and in charge of its business operations. In so directing the boat to leave, Wood failed to exercise the highest degree of care under the circumstances.

"8. The subsequent overturning of the Grand Glaize was directly and proximately caused by its negligent departure from the dock as aforesaid."

Missouri has wrongful death statutes.[2] The trial judge awarded the various claimants such damages as he determined the facts and the Missouri law authorized, and entered the decree from which this appeal is taken.

The petitioner says that the court was in error in finding that the loss resulting from the capsizing of the Grand Glaize was occasioned or incurred with the "privity or knowledge" of the petitioner, and that the court's conclusion in that regard cannot be sustained under the evidence. We are, in effect, asked to try this case *de novo* on the record.

■ While an appeal in admiralty has been said to call for a trial *de novo*, the fact findings of the trial judge, who has had the advantage of seeing the witnesses and hearing the testimony, will nevertheless be accepted unless clearly erroneous. Kulack v. The Pearl Jack, 6 Cir., 178 F.2d 154, 155. His findings, if supported by evidence, will not be disturbed. Coryell v. Phipps, 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363.

■ It is our opinion that in the trial of any nonjury case, whether in admiralty, equity or at law, where the evidence is conflicting or is such that reasonable men may honestly draw different inferences, it is for the trial judge to determine what inference shall be drawn. Weiss v. Commissioner of Internal Revenue, 8 Cir., 221 F.2d 152, 155–156. This Court will not substitute its judgment for that of a trial judge with respect to a doubtful fact issue which it is his duty and responsibility, under the law, to decide. See Cleo Syrup Corporation v. Coca-Cola Co., 8 Cir., 139 F.2d 416, 417–418, 150 A.L.R. 1056; Pendergrass v. New York Life Ins. Co., 8 Cir., 181 F.2d 136, 137–138.

■ In this case there was evidence which, if believed, would justify the conclusion that the storm clouds which heralded the storm which capsized the Grand Glaize were in plain sight at the time the boat left its dock. The petitioner argues persuasively that its evidence and certain undisputed facts and circumstances, such as petitioner's failure to protect a valuable aircraft and speed boats at its dock from the storm, completely negative the idea that the approach of the storm was visible or could be anticipated. The credibility of the witnesses, the weight of their evidence, and the determination of the fact issues were for the trial judge. On review, the claimants are entitled to have the evidence viewed in the aspect most favorable to them, and this Court is not warranted in disturbing the trial court's findings. In principle, this case does not differ greatly from Spencer Kellogg & Sons, Inc. v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903, which involved the negligence of a boat owner in exposing it to the dangers of floating ice.

■ The contention of the petitioner that the storm was to be regarded as an act of God or a peril of the sea, giving rise to no liability for damages, is, we think, without merit. Severe storms of wind and rain are not infrequent in the Middle West, and there is, we think, no reason why competent operators of excursion boats such as the Grand Glaize, on inland waters, should be unable to cope with storms without loss of life or property.

---

2. § 537.070 RSMo 1949, V.A.M.S., imposing penalties on common carriers for actionable negligence causing death, with a $10,000 maximum; and §§ 537.080 and 537.090 RSMo 1949, V.A.M.S., providing compensatory damages for wrongful death, with a $15,000 limit.

The petitioner also asserts that the court erred in admitting in evidence the opinion of a meteorologist relative to storm warnings on May 28, 1954. There is nothing to indicate that the court placed the slightest reliance upon this evidence. At the time the opinion evidence was offered and objected to, the judge said that it would not be admitted if a jury were present, but that he thought he could separate legal from illegal evidence. There was no error in this ruling. See and compare, Builders Steel Co. v. Commissioner of Internal Revenue, 8 Cir., 179 F.2d 377, 379; Wisconsin Hydro Electric Co. v. Equitable Fire & Marine Ins. Co., 8 Cir., 233 F.2d 313, 317; Green v. Dingman, 8 Cir., 234 F.2d 547, 553.

The petitioner contends that the trial judge erred in the manner in which he assessed damages under the Missouri death statutes. It is true, as the petitioner asserts, that the maritime law itself makes no provision for damages for wrongful death but that admiralty will, for loss of life, apply the wrongful death statute of the State where the cause of action arose. Levinson v, Deupree, 345 U.S. 648, 650–651, 73 S.Ct. 914, 97 L.Ed. 1319; Just v. Chambers, 312 U.S. 383, 388, 688, 61 S.Ct. 687, 85 L.Ed. 903.

As we understand the petitioner, it does not contend that the amounts of the awards for wrongful deaths were not within statutory limits, but contends that the trial judge did not follow the proper local practice in applying what are called the penalty and the compensatory wrongful death statutes of Missouri in arriving at his awards. In this proceeding in admiralty, we think that, unless the awards are demonstrably erroneous in amount, the manner in which the trial judge arrived at the awards, even if technically incorrect under local practice and procedure, would not call for a reversal of the decree appealed from and the remand of the case for retrial of the issue of damages for the wrongful deaths. Compare Levinson v. Deupree, supra, at page 652 of 345 U.S. at page 916 of 73 S.Ct.

A question as to the propriety of the substitution of the Loc-Wood Boat & Motors, Inc., as petitioner is raised. It was the owner of the Grand Glaize; the petition was originally filed in its behalf by its statutory trustees because of a temporary cancellation by the State of its charter, which was shortly thereafter restored. The substitution was proper.

The decree appealed from is affirmed.